# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION


UNITED STATES OF AMERICA

-vs-                                                    Case No.:  2:09-cr-49-FtM-29SPC

NANCY LUGO
_____


## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

_____This matter comes before the Court on the Defendant Nancy Lugo's  Motion to Suppress Statements and Physical Evidence and Incorporated Memorandum of Law (Doc. #22) filed on November 25,  2009. The Government's Response to the Motion to Suppress Statements and Physical Evidence (Doc. #24) was filed on December 11, 2009.  A hearing was set before the undersigned United States Magistrate Judge on December 16, 2009.

At the hearing, the Defendant was present and represented by Assistant Federal Public Defender Frank Zaremba.  The Government was represented by Assistant United States Attorney Jeffrey Michelland.  The Government called two witnesses, Curtis James Clay, and Mayra Egley, and introduced an aerial photograph of the scene (Govt. Ex. #1).  The Defendant did not call any witnesses to the stand nor introduce any items of evidence.

## TESTIMONY AND EVIDENCE

**Curtis James Clay** (Tr. 4-64)

Curtis Clay (Det. Clay) is a detective with the Clewiston Police Department (CPD) and has served in that capacity since 2002.  (Tr. 4:10-11).  Previously,  he worked for the Hendry County

Sheriff's Office (HCSO) for approximately 5 years starting in corrections, road patrol, K-9 and then became a K-9 supervisor. (Tr. 4:17-22, 5:1-4). Det. Clay currently runs the investigations department and the special operations section at CPD. (Tr. 5:6-9).

Det. Clay was on duty on May 27, 2009 at 4:00 in the afternoon. (Tr. 5:25, 6:1-4). He received a radio call regarding an alarm of an actual robbery at Sea Coast National Bank. (Tr. 6:7-8). Directly after the alarm, there was a call from one of the tellers stating they had been robbed. (Tr. 6:9-11). He immediately responded to the scene which was approximately 1 mile away. (Tr. 6:12-18). Originally, it was relayed that the suspect had left the bank and went south. (Tr. 6:19-21). He responded to the area of Berner Road which is the road to the west of the bank and headed south from that area in an attempt to intercept the suspect. (Tr. 6:21-24). While he was traveling south on Berner Road, Ofc. Taylor, CPD, was making contact with the complainants at the bank. (Tr. 7:11-13). Ofc. Taylor relayed that a blue truck was leaving the post office. (Tr. 7:13-15). The radio call indicated that Ofc. Taylor had witnessed a female matching the description of the suspect leaving the post office and entering the blue truck. (Tr. 7:16-18). Det. Clay was directed to stop the vehicle and therefore, performed an investigative stop. (Tr. 41:13-25, 42:1-23, 48:5).

Det. Clay was traveling on Alverdez at that time and witnessed a blue truck pull out onto Alverdez from the post office driveway. (Tr. 11:4-11). He was driving an unmarked vehicle but activated his emergency lights. (Tr. 14:2-17). The driver of the truck pulled over. He made contact with the driver whom he identified as the Defendant. (Tr. 14:25, 15:1-10). He approached the vehicle, identified himself, and advised the Defendant that he was stopping her because she matched the description of the suspect in the bank robbery. (Tr. 16:1-13). He asked her if she had just left the post office to which she replied no but that she had seen a young lady with dark, long hair, blue

jeans, and a blue bag running into the apartment buildings directly to the east of the location. (Tr. 16:19-25). The description he had at the time was a young lady, white or Hispanic, with long hair and blue jeans. (Tr. 17:4-8). Det. Clay immediately advised other officers over the radio of the Defendant's observations regarding the apartment complex so that they could set up a perimeter around the apartments to further investigate. (Tr. 18:4-9). Det. Clay confronted the Defendant with the fact that he had seen her vehicle in the post office. (Tr. 26:14-16). She said her vehicle was parked there but that she had walked to her vehicle. (Tr. 26:16-17). When asked where she had walked from, she got quiet. (Tr. 26:17-18).

The weather conditions that day were rainy and cloudy. (Tr. 18:10-12). When Det. Clay came into contact with the Defendant, she was wet, she was very nervous in that her eyes got bigger, her face had some discoloration, she continued to look around and did not appear to be comfortable with the situation, and she started to shake. (Tr. 18:15-25, 19:1-7). She was wearing blue jeans. Because he was unsure based upon her statements if she was a suspect or a witness, he decided to get further information from her including her name and date of birth. (Tr. 19:17-25).

Det. Clay asked the Defendant if she minded stepping back to his vehicle to which she responded she did not mind. (Tr. 20:14-16). She was not handcuffed but sat in the back seat of his vehicle with the door open. (Tr. 21:10-22). He asked her for her identification, however, she said she did not have any. (Tr. 22:7-12). At that point in time, Ofc. Myra Egely (Ofc. Egely) arrived.(Tr. 20:20-22). For officer safety, Det. Clay asked the Defendant whether she minded if they patted her down for weapons. (Tr. 22:22-25, 23:1-3). The Defendant consented. (Tr. 24:9-11). No weapons were found. (Tr. 24:14-15). At that point in time, he asked the Defendant if Ofc. Egely could search her vehicle and see if there were any weapons or anything having to do with the bank robbery. (Tr.

24:25, 25:1-6).  The Defendant consented to the search by saying okay, yes.  (Tr. 25:13, 28:18-19).  He in no way forced, threatened, or coerced her to give consent.  (Tr. 27:22-23).  She was not handcuffed and he did not brandish a firearm.  (Tr. 27:16-18, 28:6-7).

Ofc. Egely went to look in the vehicle.  (Tr. 25:13).  About that time, Sgt. Chad Pelham asked him over the radio if he was sure the Defendant was not the suspect because he had spoken to witnesses at the apartment complex who had been outside and had not seen anyone enter the apartment complex.  (Tr. 25:14-19 ).  The Defendant was not free to leave because she was a suspect in the matter and he needed to develop additional information.  (Tr. 51:20-25, 52:1-4)  He immediately turned around and asked her "Were you involved in this bank robbery?" (Tr. 25:24-25, 29:7-9, 12-14).  Her response was "I needed the money."  (Tr. 29:9-10).  When she answered his question, she looked down, appeared solemn, almost ashamed. (Tr. 29:15-19).  He at that point gave the Defendant her Miranda warnings from memory. (Tr. 29:25, 30:5-14).   He asked her if she understood her rights to which she responded yes.  (Tr. 30:15-16).

At about the same time that he was reading the Defendant her Miranda warnings, Ofc. Egely was searching the truck and held up a pair of latex gloves.  (Tr. 31:21-23, 32:2-3).  Ofc. Egely brought him the Defendant's license which she told him was laying in plain view in the truck.  (Tr. 32:9-14).  The Defendant was advised she was under arrest, was handcuffed, and was placed in Ofc. Egely's patrol unit.  (Tr. 32:17-22).  When he ran the Defendant's license, he determined that it was suspended.  (Tr. 32:23-25, 33:1-2).  Later at the station, he issued a citation for the offense of driving on a suspended driver's license. (Tr. 33:3-7).

Det. Clay then went to the Defendant's vehicle and conducted a more extensive search.  (Tr. 33:16-19).  He located a blue backpack that contained U.S. currency, latex gloves, a firearm, some

– 4 –

clothing, and a brown pair of sunglasses. (Tr. 33:24-25).[1] The backpack was underneath the driver's seat with the opening part towards the gas pedal of the vehicle. (Tr. 34:3-6). He also located a gray T-shirt and a pair of knit gloves. (Tr. 34:8-11).

At a later time, he received a call from a Matthew Cleary, III, indicating that he was the Defendant's attorney and that he did not wish for them to speak to her. (Tr. 36:11-21). As he was walking back to his office from communications, the Defendant asked to speak with him. (Tr. 36:22-25). He informed her that her attorney had called and did not want her to speak with him at all but it was her choice. (Tr. 37:1-4). She then asked if she could speak to Det. Clay with her attorney present. (Tr. 37:3-4). Mr. Cleary arrived at the station, met with the Defendant in an interview room, they started a formal interview with Det. Clay, and then the Defendant invoked her rights. (Tr. 57:2-25, 58:1-3). After the Defendant was placed back into a holding cell, Mr. Cleary indicated that he was speaking as a civilian and not her attorney and that he was involved in a relationship with the Defendant and that she had taken his firearm. (Tr. 37:11-17).

**Mayra Egley** (Tr. 64-94)

Mayra Egley is a retired police officer who previously worked for the CPD as a road patrol officer for approximately 11 months and for HCSO from 1987. (Tr. 65:8-25) She was on patrol on May 27, 2009, at approximately 4:00 pm. (Tr. 66:10-13). She was helping with the perimeter in reference to a bank robbery and responded to the traffic stop Det. Clay had on a vehicle on

---

[1] A detailed inventory list included: one pair of latex gloves, one pair of brown sunglasses, one pair of gray cloth gloves, a pair of brown shoes, a black Samsung phone, one gray T-shirt, one blue and black Nike bag, forty 10-dollar bills, five 50-dollar bills, one 100, and nine 20-dollar bills in U.S. currency, totaling $2180.00. He also located 63 five-dollar bills, equaling $315.00, 105 one-dollar bills equaling $105.00, one two-dollar bill equaling $2.00, and one blue steel Taurus .40 caliber handgun model P7Z1/7Pro with magazine, ten black zip ties, one brown ball cap with a Corona symbol written on it, and one pair of sunglasses silver in color.

Alverdez. (Tr. 66:18-21). When she exited her vehicle, she observed a white female with long black hair sitting in the back of Det. Clay's vehicle with the door open. (Tr. 68:8-22). Prior to arriving at the traffic stop, she had learned that the suspect in the bank robbery was a female with long black hair, wearing jeans, a white shirt and carrying a backpack. (Tr. 69:11-12). The Defendant was wearing blue jeans, a white shirt, and tennis shoes. (Tr. 70:16-17).

The Defendant was looking from side to side, her hair was in disarray and she was soaking wet. (Tr. 71:2-4). After she arrived, Det. Clay asked her to pat down the defendant for any weapons. (Tr. 71:13-16). The Defendant did not have any weapons on her. (Tr. 71:17). Det. Clay then asked the Defendant if Ofc. Egley could look in her truck. (Tr. 71:17-18). She also overheard Det. Clay ask the Defendant if she had any identification and the Defendant responded that she did not have any on her. (Tr. 72:6-7). After the Defendant agreed to the search of her vehicle, Ofc. Egley walked over to the passenger side of the vehicle and looked through the window. (Tr. 74:5-7). She saw a grey T-shirt which appeared damp and was bundled up. (Tr. 75:18-20). She saw some shoes, some gloves, a cell phone, and a Florida driver's license. (Tr. 75:20-21). She then opened the driver's door, picked up the latex gloves, showed them to Det. Clay, and grabbed the Florida driver's license. (Tr. 75:8-12). At that time, she heard over the radio that Det. Clay said he had a suspect. (Tr. 75:14-15). She put the gloves back, and took the driver's license over to Det. Clay. (Tr. 75:15-18). She heard Det. Clay giving the Defendant her constitutional rights and heard the Defendant indicate that she understood her rights. (Tr. 75:19-25, 76:1-13). The Defendant was placed under arrest by Det. Clay and transported by Ofc. Egley to the holding cell at the CPD. (Tr. 76:15-18). When she was putting the Defendant into the back seat of the patrol car, she overheard Sgt. Spence ask Det. Clay where the gun was located. (Tr. 76:22-25, 77:1). She turned to the Defendant and asked her where

the gun was located because she was concerned with the location of the apartment buildings and the families that live there and that they would not be able to find the gun. (Tr. 76:1-6). The Defendant told her the gun was under the seat. (Tr. 76:7). When they were exiting the vehicle to go into the station, the Defendant asked if she could call an attorney. (Tr. 78:16-20). While at the police department, Ofc. Taylor called and asked Ofc. Egley to ask the Defendant whether she had a tattoo on the side of her neck. (Tr. 78:9-11). The Defendant pulled her hair over and allowed her to look. (Tr. 78:12-13).

## DISCUSSION

The Defendant argues that any statements made or evidence gathered at the traffic stop should be suppressed because: (1) the traffic stop of the Defendant's vehicle was illegal; (2) the detention of the Defendant after the traffic stop was concluded was not supported by probable cause or reasonable suspicion; (3) the search of the Defendant's vehicle was unlawful; and (4) any statements made by the Defendant should be suppressed as the product of the illegal stop, detention and search. The Government responds that there was sufficient reasonable suspicion that the Defendant had committed a crime to conduct the stop and detain the Defendant. The Government also states that the search of the vehicle was consensual and that the Defendant's incriminating statements were made either voluntarily or were covered by Miranda.

### *(1) Whether the Traffic Stop of the Defendant's Vehicle was Illegal*

A traffic stop constitutes a seizure within the meaning of the Fourth Amendment. However, a traffic stop is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by a reasonable suspicion based upon objective facts that an individual is engaged in criminal activity. Terry v. Ohio, 392 U.S. 1, 30, 88 S. Ct. 1868, 20 L. Ed.2d 889 (1968).

The United States Supreme Court has found that a police officer may, consistent with the Fourth Amendment, briefly stop an individual who appears to be engaged in criminal activity if the officer has a reasonable and articulable suspicion that criminal activity is afoot. U.S. v. Swain, 2009 WL 499260 * 3 (M.D. Fla. February 26, 2009) (citing Terry v. Ohio, 392 U.S. at 27)). The "reasonable suspicion" must be more than an "inchoate and unparticularized suspicion or hunch." Id. Reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than a preponderance of the evidence, however, the Fourth Amendment requires at least a minimal level of objective justification, taken from the totality of the circumstances, before a stop can be made. U.S. v. Powell, 222 F.3d 913, 917 (11th Cir. 2000) (citing Illinois v. Wardlow, 528 U.S. 119, 120 S. Ct. 673, 145 L.Ed. 2d 570 (2000)).

When determining whether reasonable suspicion exists to believe criminal activity is afoot, "the court must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." U. S. v. Hunter, 291 F.3d 1302, 1306 (11th Cir.2002) ( internal quotation marks omitted ). Though there must be an objective basis for suspecting wrongdoing, officers may assess the facts in light of their unique training, expertise, and experience in the field. U.S. v. Arvizu, 534 U.S. 266, 273-75, 122 S. Ct. 744, 151 L. Ed.2d 740 (2002). Moreover, reasonable suspicion exists if the cumulative information of which the detaining officer is aware suggests criminal activity, even if each fact, viewed in isolation, can be given an innocent explanation. Id.

The Defendant states there was no valid reason to stop her vehicle as she had not committed any traffic infractions and suggests that the officers stopped her vehicle for no other reason than the fact she was a Latin female. The Defense's argument lacks merit.

In this instance, Det. Clay received a radio dispatch that a bank robbery had occurred. (Tr. 6:7-8). Directly after the alarm, there was a call from one of the tellers stating they had been robbed. (Tr.6:9-11). He immediately responded to the scene which was located approximately 1 mile away. (Tr. 6:12-18). Originally it was relayed that the suspect had left the bank and headed south. (Tr. 6:19-21). Det. Clay responded and while Det. Clay was traveling south on Berner Road, Ofc. Taylor, CPD, was making contact with the complainants at the bank. (Tr.7:11-13). The radio call indicated that Ofc. Taylor had witnessed a female matching the description of the suspect leaving the post office and entering a blue truck. (Tr. 7:16-18). Ofc. Taylor relayed that a blue truck was leaving the post office.(Tr. 7:13-15). Det. Clay was directed to stop the Defendant who was driving the blue truck and which had just exited from the post office. (Tr. 41:13-25, 42:1-23, 48:5). Det. Clay stopped the Defendant and began his investigation.

It is clear from Det. Clay's undisputed testimony that he had a reasonable suspicion to believe the Defendant was engaged in criminal activity. The Defendant matched the description of the individual that robbed the bank, she was very nervous, and gave false information about seeing an individual who matched the bank robber's description run toward the adjacent apartment building. (Tr. 16:19-25, 18:15-25, 19:1-7). Det. Clay stopped her just minutes after the robbery occurred and after he was given a description of the suspect being a white or Hispanic female with long dark hair and wearing a white shirt and blue jeans. (Tr.17:4-8). Ofc. Taylor told Det. Clay the suspect fled toward the post office and was seen getting into a blue truck. (Tr. 7:16-18).

The Defendant is a Hispanic female with long dark hair who at the time of the stop was wearing a white shirt and blue jeans. The Defendant was exiting the post office driving a blue pick up approximately 150 yards from the bank that was just robbed. (Tr. 56:14-15). Moreover, Det.

Clay was informed by Ofc. Taylor, who was at the bank, to stop the blue truck because the driver matched the description of the suspect involved in the robbery. (Tr.41:13-25, 42:1-23, 48:5).

Based upon the information provided to Det. Clay, as well as his own observations, a reasonable officer in the same place and circumstances would have made the same decision and stopped the Defendant. As a result, it is respectfully recommended that Det. Clay had sufficient reasonable suspicion to stop the Defendant under the standard established by the Supreme court in Terry v. Ohio.

### (2) Whether the Detention of the Defendant was Supported by Probable Cause or Reasonable Suspicion

The Defendant argues the detention lasted longer than was necessary to effect the purpose of the traffic stop. For a Terry stop to be valid, "it must be temporary and last no longer than is necessary to effectuate the purpose of the stop" and the officer should employ the least intrusive means available to dispel the officer's suspicion in a timely fashion." U.S. v. Simms, 385 F.3d 1347, 1353 (11th Cir.2004) (quoting Florida v. Royer, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed.2d 229 (1983)); U.S. v. Purcell, 236 F.3d 1274, 1277 (11th Cir.2001). In assessing whether a detention is too long in duration to be justified as an investigative stop, it is appropriate for the court to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. Sharpe, 470 U.S. at 686. "The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." Id.

The Eleventh Circuit established a nonexclusive check list of four factors for the court to consider when reviewing whether or not the detention of a suspect was proper under Terry. In

United States v. Acosta, the Eleventh Circuit stated the court should consider the law enforcement purposes served by the detention, the diligence with which the police pursued the investigation, the scope and intrusiveness of the detention, and the duration of the detention. 363 F.3d at 1146 (quoting U.S. v. Gil, 204 F.3d 1347, 1351 (11th Cir.2000)).

### (a) Purpose Served by the Defendant's Detention

In analyzing whether law enforcement purposes are served by the detention, courts consider whether the officer detained the defendant to pursue a method of investigation likely to confirm or dispel the officer's suspicions quickly with minimal interference. Lehman v Hunter, 2009 WL 536541 * 7 (M.D. Fla. March 3, 2009) (citing Acosta, 363 F. 3d at 1146). In this instance, the purpose of the stop was to investigate whether or not the Defendant was the bank robber, a witness, or merely an innocent victim of circumstances.

Det. Clay received a radio call that indicated Ofc. Taylor had witnessed a female matching the description of the suspect leaving the post office and entering a blue truck. (Tr. 7:16-18). Det. Clay was directed to stop the blue truck and based upon that direction performed an investigative stop on the Defendant's vehicle. (Tr. 41:13-25, 42:1-23, 48:5). Det. Clay testified that he approached the Defendant's vehicle, identified himself, and advised that he was stopping her because she matched the description of the suspect in the bank robbery. (Tr. 16:1-13). Because the Defendant was wet and shaking, Det. Clay decided to get further information from her including her name and date of birth. (Tr. 19:17-25). Det. Clay testified he did not know, at that time, whether the Defendant was a suspect or a witness, therefore, he asked her if she minded stepping back to his vehicle. (Tr. 20:14-16).

Det. Clay asked her if she had just left the post office to which she replied no but that she had seen a young lady with dark, long hair, blue jeans, and a blue bag running into the apartment buildings directly to the east of the location. (Tr. 16:19-25). The description he had at the time was a young lady, white or Hispanic, with long hair and blue jeans. (Tr. 17:4-8). Det. Clay immediately advised other officers over the radio of the Defendant's observations regarding the apartment complex so that they could set up a perimeter around the apartments to further investigate. (Tr. 18:4-9). When no one fitting the Defendant's description was seen in or around the apartment complex, Det. Clay continued his investigation. (Tr. 25:24-25, 29:7-9, 12-14).

It is clear Det. Clay merely detained the Defendant for the purpose of determining if she was the bank robber, a witness, or an innocent bystander.

### (b) Officer Diligence

"Under the second factor, the Eleventh Circuit asks, "whether the police were diligent in pursuing their investigation, that is whether the methods the police used were carried out without unnecessary delay." Croom v Balkwill, -----F. Supp.------, 2009 WL 3870794 * 13 (M.D. Fla November 18, 2009) (citing Acosta, 363 F.3d at 1146).

The description Det Clay had of the bank robber was a young lady, white or Hispanic, with long hair and blue jeans. Det. Clay asked the Defendant if she had just left the post office to which she replied no but that she had seen a young lady with dark, long hair blue jeans and a blue bag running into the apartment buildings directly to the east of the location. (Tr.16:19-25). Det. Clay immediately advised other officers over the radio of the Defendant's observations regarding the apartment complex so they could set up a perimeter around the apartments to further investigate. (Tr. 18:4-9). Det. Clay confronted the Defendant with the fact that he had seen her vehicle leaving the

post office, and the post office was just south of the bank that was just robbed. (Tr. 26:14-16). The Defendant said her vehicle was parked there but that she had walked to her vehicle but when asked where she had walked from, she got quiet. (Tr. 26:17-18).

Det. Clay stated that when he came into contact with the Defendant, she was wet, she was very nervous in that her eyes got bigger, her face had some discoloration, she continued to look around and did not appear to be comfortable with the situation, and she started to shake. (Tr. 18:15-25, 19:1-7). Det. Clay testified the Defendant fit the description of the individual purported to have robbed the bank. (Tr. 16:1-13). Based upon the Defendant's statements, Det. Clay stated that he was unsure if she was a suspect or a witness, so he decided to get further information from her including her name and date of birth. (Tr. 19:17-25). Det. Clay asked her for her identification, however, she said she did not have any. (Tr. 22:7-12).

Det. Clay's investigation was on point with the purpose of the initial traffic stop. The officers involved followed up on the Defendant's statements that she saw an individual fitting the robbers description running toward the apartment complex in a timely fashion as Det. Clay continued his investigation into the Defendant's behavior and actions. All of Det. Clay's actions were concluded in brief time span and were directly related to the investigation of the bank robbery.

### (c) Intrusiveness of the Detention

Under the third factor, the Eleventh Circuit asks, "whether the scope and intrusiveness of the detention exceeded the amount reasonably needed by police to ensure their personal safety." Croom, -----F. Supp.------, 2009 WL 3870794 at * 13 (citing Acosta, 363 F.3d at 1146). Prior to her arrest, the Defendant was not hand cuffed and although she was not free to leave no coercion or physical force was used against her. The officers were involved in an investigation of an individual that was

a suspect in an armed robbery, yet the Defendant was not cuffed nor were threats of arrest or possible jail time made. Instead Det. Clay merely had her sit in the back of his vehicle while other officers investigated the Defendant's claim that she saw someone fitting the robbers description headed toward the nearby apartments. Clearly the intrusiveness of the stop did not exceed the reasonableness standard under the Fourth Amendment given the totality of the circumstances and the danger an armed robber presented to the officers and the local community.

### (d) Duration of the Detention

There is no bright line rule regarding the permissible duration of an investigative stop. Croom, -----F. Supp.------, 2009 WL 3870794 at * 13 (citing Acosta, 363 F.3d at 1146). The test is one of common sense and ordinary human experience. Croom, -----F. Supp.------, 2009 WL 3870794 at * 13 (citing Acosta, 363 F.3d at 1146). In United States v. Sharp, the Supreme Court explained that the courts "must consider whether the police diligently pursued a means of investigation likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. 470 U.S. 675, 686, 105 S. Ct. 1568, 84 L. Ed. 2d 605.

The detention, in this instance, lasted only a few minutes up to the point when the Defendant stated that she "needed the money." (Tr. 29:9-10). At that time, the Defendant was arrested on suspicion of bank robbery. The detention of the Defendant met the standards established by the Eleventh Circuit in Acosta, because it was directly related to the officers investigation of the bank robbery, the officers acted quickly in following up leads, and maintained a focus on the robbery investigation. Thus, it is respectfully recommended that the detention was not overly drawn out and the purpose and scope of Det. Clay's investigation was specifically directed to the purpose of the

traffic stop which was to investigate whether or not the Defendant was involved in the bank robbery.

### (3) Whether the Search of the Defendant's Vehicle was Unlawful

There were two (2) searches of the Defendant's vehicle:   one prior to her arrest,  and one subsequent to her arrest.  The Defendant argues the searches of her vehicle violated the Fourth Amendment. The Government argues the searches were consensual or in the alternative the search was valid incident to arrest.

### (a) Vehicle Search Prior to Arrest

### (i) The Defendant Voluntarily Consented to the Search

A search of property without a warrant or probable cause is proper under the Fourth Amendment when it is preceded by valid consent. Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S. Ct. 2041, 36 L. Ed.2d 854 (1973).  The voluntariness inquiry is a factual one assessed from the perspective of the "totality of the circumstances." U.S. v. Mohamed, 546 F. Supp. 2d 1324, 1332-1333 (M.D. Fla.2008) (citing  Schneckloth, 412 U.S. at 227)). In evaluating the totality of the circumstances, a court should look at several "indicators": "the presence of coercive police procedures; the extent of the defendant's cooperation with the officer; the defendant's awareness of his right to refuse consent; the defendant's education and intelligence; and the defendant's belief that no incriminating evidence will be found." Mohamed, 546 F. Supp. 2d at 1333 (citing United States v. Simms, 385 F.3d 1347, 1355 (11th Cir.2004) quoting United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir.2001)).  All these factors weigh against the Defendant.

After Ofc. Egely arrived, for officer safety, Det. Clay asked the Defendant whether she minded if they patted her down for weapons.   (Tr. 22:22-25, 23:1-3).  The Defendant consented.

(Tr. 24:9-11).  No weapons were found.  (Tr. 24:14-15).  At that point in time, Det. Clay asked the Defendant if Ofc. Egely could search her vehicle and see if there were any weapons or anything having to do with the bank robbery in the truck. (Tr.24:25, 25:1-6).  The Defendant consented to the search by saying okay, yes. (Tr. 25:13, 28:18-19).  The Defendant was not forced, threatened, or coerced to give her consent. (Tr.27:22-23).  She was not handcuffed and neither Det. Clay nor Ofc. Egley brandished a firearm while talking with the Defendant. (Tr. 27:16-18, 28:6-7).  The Defendant was cooperative and understood what Det. Clay and Ofc. Egley were saying to her. When asked for a pat down search and then subsequently for permission to search the vehicle the Defendant voluntarily consented.

The search of a vehicle does not violate the Fourth Amendment when the Defendant offers their voluntary consent. Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). Therefore, it is respectfully recommended that the search of the Defendant's vehicle did not violate the Fourth Amendment because her consent was voluntarily given.  Moreover, even if she had not consented to the search of the vehicle, there was good cause to perform a warrantless search of the vehicle under the automobile exception due to officer and public safety issues.

### (ii) Automobile Exception

The automobile exception holds that "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." U.S. v. Watts, 329 F.3d 1282, 1285 (11th Cir. 2003).  No special exigency is required for a warrantless search beyond a showing that the vehicle is mobile. Maryland v. Dyson, 527 U.S. 465, 467, 119 S. Ct. 2013 (1999) (per curiam).  Furthermore, the Supreme Court has held that if there was probable cause to search a vehicle, a warrantless search would not be deemed a violation

of the Fourth Amendment if the facts of the case would have justified a warrant even through a warrant was not actually obtained. <u>U.S. v. Ross</u>, 456 U.S. 798, 809, 102 S. Ct. 2157, 2152 (1982);<u>U.S. v. Lindsey</u>, 482. Probable cause for a search exists when under the totality of the circumstances "there is a fair probability that contraband or evidence of a crime will be found in a particular place."<u>U.S. v. Goddard</u>, 312 F.3d 1360, 1363 (11th Cir. 2002) (citing <u>Illinois v. Gates</u>, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed.2d 527 (1983)).

In this case, there was a fair probability that contraband or evidence of the bank robbery was in the Defendant's truck given the robbery had just taken place. Det. Clay was directed to stop the blue truck driven by the Defendant by Ofc. Taylor because the Defendant was considered a suspect after Ofc. Taylor spoke with the bank's personnel just after the robbery. (Tr. 7:11-18, 41:13-25, 42:1-23, 48:5). The Defendant fit the description of the robber and her vehicle was stopped pulling out of the post office parking lot adjacent to the bank. When asked about whether she had pulled out of the bank parking lot, she was untruthful. Further, the Defendant's account of seeing a woman fitting the description of the bank robber run towards the apartment complex near the bank proved to be false. Given the circumstances, Det. Clay and Ofc. Egley had probable cause to search the vehicle given that it was mobile and there was a fair probability the vehicle contained contraband and/or evidence of the bank robbery. Thus, it is respectfully recommended that there was sufficient probable cause to search the Defendant's vehicle.

<u>(b) Vehicle Search After the Arrest</u>

After the Defendant was arrested, Ofc. Egley put her into the back seat of the patrol car. Ofc. Egley testified that she overheard Sgt. Spence ask Det. Clay where the gun was located. (Tr. 76:22-25, 77:1). Ofc. Egley then turned to the Defendant and asked her where the gun was located because

she was concerned with the location of the apartment buildings and the families that live there and that they would not be able to find the gun. (Tr. 76:1-6). The Defendant told her the gun was under the seat. (Tr. 76:7). Det. Clay then went to the Defendant's vehicle and conducted a more extensive search. (Tr. 33:16-19).

While the Defendant argues the search incident to arrest was invalid, the Defendant had just a few moments earlier given her consent to the search of the vehicle. There was no evidence presented that the Defendant's consent was ever revoked after her arrest. Therefore, it appears that the existing consent was never revoked and the officers could continue the consensual search.

Even if the Defendant had revoked her consent, the officers could still search the vehicle incident to the arrest. The Defendant argues from Arizona v. Gant, ------- U.S. --------, 129 S. Ct. 1719, 173 L. Ed. 2d 485 (2009), that the search incident to arrest was invalid. The Government argues the search incident to arrest was proper. In Gant, the defendant was arrested for driving with a suspended license, handcuffed, and secured in the back of a patrol car. 129 S. Ct at 1715. Afterwards, two police officers searched the defendant's car without a warrant and discovered a gun and a bag of cocaine. Id. The trial court found the police lacked probable cause for the search, but nonetheless held the officers had conducted a valid search incident to an arrest. Id.

On appeal, however, the Arizona Supreme Court held that the search was not a proper search incident to an arrest because any legitimate concerns for officer safety or preservation of evidence faded once the defendant was secured in the patrol car. Id. at 1714. The Supreme Court agreed, reasoning that "[a] rule that gives police the power to conduct such a search whenever an individual is caught committing a traffic offense, when there is no basis for believing evidence of the offense might be found in the vehicle, creates a serious and recurring threat to the privacy of countless

individuals." Id. at 1720. Accordingly, the Court held that "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." Id. at 1723.

In this case, unlike Gant, the Defendant was not stopped for a traffic infraction but for suspicion of armed bank robbery. Thus, it was reasonable for Det. Clay and/or Ofc. Egley to search the Defendant's vehicle for evidence of the bank robbery, including the firearm used in the robbery. Thus, the search incident to arrest was proper in this case instance and did not violate the Defendant's Fourth Amendment rights.

### (4) Whether the Defendant's Miranda Rights were Violated

The Defendant argues that any statements she made were made incident to her illegal stop and detention and should therefore be suppressed. The Government states the Defendant was not in custody for Miranda purposes when she made the incriminating statements.

Miranda v. Arizona, requires that before a defendant in custody can be interrogated that the Defendant be informed of: (1) the Defendant's right to remain silent; (2) that statements can and will be used against them in a court of law; (3) that the Defendant has the right to an attorney during questioning; and (4) that if the Defendant cannot afford an attorney one will be appointed. 384 U.S. 436, 478-479, 86 S. Ct. 1602, 16 L. Ed. 694 (1966).

The Supreme Court defined interrogation as "express questioning or words and actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect. Rhode Island v. Innis, 446 U.S. 291, 300-301, 100 S. Ct. 1682, 64 L. Ed. 297 (1980). Some types of questions are not considered interrogations and therefore do not require

Miranda warnings.  Courts have concluded that routine that general on-the-scene questioning is not

interrogations for purposes of Fifth Amendment and Miranda warnings. *See* U.S. v. Ozuna, 170 F.3d

654, 657-659 (6th Cir. 1999) (holding that asking routine questions about a person's identity and

natural origin were not interrogations for Miranda purposes); *But see e.g.* U.S. v. Gonzalez-

Sandoval, 894 F.2d 1043, 1046-1047 (9th Cir. 1990) (holding that an interrogation occurred where

border agents had reason to believe that a person was entering the country illegally and therefore

would incriminate themselves with their answers).

Det. Clay testified approximately the time that Ofc. Egely went to look inside the

Defendant's vehicle based upon the Defendant's consent, Sgt. Pelham asked him over the radio if

he was sure  the Defendant was not the suspect because he had spoken to witnesses at the apartment

complex who had been outside and had not seen anyone enter the apartment complex. (Tr. 25:14-19).

The Defendant was not free to leave because she was a suspect in the matter and he needed to

develop additional information.  (Tr. 51:20-25,  52:1-4).  He immediately turned around and asked

her "Were you involved in this bank robbery?" (Tr. 25:24-25, 29:7-9, 12-14).  Her response was "I

needed the money." (Tr. 29:9-10).  Det. Clay at that point gave the Defendant her Miranda warnings

from memory. (Tr.29:25, 30-5-14).  He asked her if she understood her rights to which she

responded yes. (Tr. 30:15-16).

It is clear the question, "[w]ere you involved in this bank robbery" was intended to illicit an

incriminating response.  The issue then was whether or not the Defendant was in custody for

purposes of Miranda when Det. Clay asked her if she were involved in the bank robbery.  The

requirement that an individual receive Miranda warnings before answering questions applies only

when the individual is in custody. U.S. v. Mohammed, 2009 WL 2242387 * 3 (M.D. Fla. July 24,

2009). Under Miranda, custody is the depravation of freedom of action normally associated with an arrest. Id. at 444. The initial determination of custody depends on the objective circumstances of interrogation and not on the subjective views harbored by either the officer or the Defendant. Stansbury v. California, 511 U.S. 318, 323 (1994) (*per curiam*). A person detained pursuant to a routine traffic stop is not ordinarily considered in custody. Berkemer v. McCarty, 468 U.S. 420, 441, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984).

While she was not free to leave, a person is not free to leave during a Terry stop – Terry stops are not subject to the dictates of Miranda. Acosta, 363 F.3d at 1148. The Supreme Court in Berkemer v. McCarty, 468 U.S. 420, 104 S. Ct. 3138, 82 L. Ed.2d 317 (1984), explained that the non-threatening nature of a Terry stop is the reason for "the absence of any suggestion in [the Court's] opinions that Terry stops are subject to the dictates of Miranda." Acosta, 363 F.3d at 1148.

While there was an ongoing investigation and the Defendant was not free to leave, she was not restrained to the degree associated with a formal arrest. Det. Clay testified that he asked the Defendant if she minded stepping back to his vehicle to which she responded she did not mind. (Tr. 20:14-16). She was not handcuffed but sat in the back seat of his vehicle with the door open. (Tr. ) No threats or coercion were used against her. (Tr. 27:22-23). No guns were drawn and no statements were made informing her that she was under arrest. (Tr. 27:16-18, 28:6-7). *See* U.S. v. Moya, 74 F. 3d 1117, 1119 (11th Cir. 1996)(holding that an individual held in a room at a border check point was not in custody because, no handcuffs were used, no guns were drawn, and the defendant was never subjected to booking procedures even though he was locked in a separate office and questioned by agents). Even though Det. Clay may have believed the Defendant was the robbery suspect, it is the compulsive aspect of the custodial interrogation and not strength or content of the

officer's suspicions that governs whether or not an individual is in custody. <u>U.S. v Trinidad</u>, 2006 WL 1281034 * 3 (M.D. Fla. May 10, 2009).

Thus, based upon the evidence presented at the hearing, it is respectfully recommended that the Defendant was not in custody for purposes of <u>Miranda</u> and her pre-<u>Miranda</u> response "I needed the money" should not be suppressed.

After the Defendant stated "I needed the money," Det. Clay arrested her and recited her <u>Miranda</u> rights to her. (Tr. 29:9-10, 25, 30:5-14). The Defendant told Det. Clay she understood those rights. (Tr. 30:15-16). Det. Clay's testimony was supported by the testimony of Ofc. Egley who overheard Det. Clay recite the Defendant her <u>Miranda</u> rights and heard the Defendant say she understood those rights. (Tr. 75:19-25, 76:1-13). Consequently, the Court respectfully recommends that the Defendant's <u>Miranda</u> rights were not violated.

Accordingly is now

**RESPECTFULLY RECOMMENDED:**

The Motion to Suppress Statements and Physical Evidence and Incorporated Memorandum of Law (Doc. #22) should be **DENIED**.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully recommended** at Fort Myers, Florida, this ___6th___ day of January, 2010.

*Sheri Polster Chappell*
SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record